Good morning, your honors. May it please the court, on behalf of plaintiff, my name is Julian Swanson. Can everyone hear me? Yes. Oh, excellent. So this is a social security disability appeal. It's been pending for, well, he last worked in 2014, so we're coming up 10 years since he's been out of the workforce. He was denied by the ALJ. We appealed and we want a partial award or a partial remand on the basis of the ALJ discrediting one of the treating sources. And the reason we're appealing here to this court is I feel there is additional error insofar as the ALJ dismissed all of the treating sources, accepted the opinion of the non-treating examining medical provider, and disregarded Mr. Sakowitz's testimony about his own, the severity of his symptoms. Sort of for larger context, this is a fibromyalgia case. And that's, I think, the sort of the crux of what went wrong here. The law has changed over the years. Medical providers' approach to fibromyalgia has changed. But where we are now is that this is a sort of a mysterious, difficult-to-treat, difficult-to-diagnose disease. So can I just stop you there? So in Revels, the ALJ had relied on the lack of objective laboratory tests, and that was an error given how fibromyalgia works. And there's also the waxing and waning aspect that Revels talked about. But I'm not sure I saw the ALJ making those particular errors. The ALJ might have misunderstood the life activities or something. But what are the fibromyalgia errors that this ALJ made? The error is in the importance that the ALJ gave to the good days. So where Mr. Sakowitz, and these are all in the medical records, these reports of him taking vacations or taking his sons to school, doing certain activities that he was able to do. I mean, there's two things happening. The activities caused exacerbation and additional pain, which I think the ALJ ignored. But the other thing is these are the good days of fibromyalgia. So the thing that I wasn't sure about, though, is it seems like he was doing these things every day. So this seemed different than Revels somewhat. And you may have arguments about errors, but I wasn't sure it was this error. How do you say the problem is good days and bad days when it seems like he was taking the kids to school every day and doing the house tasks to take care of them every day, like cooking? I don't think the record supports every day. I think this is where the cherry picking was happening. There's reports in the record where he's telling his providers, you know, I'm trying to do this. I'm able to do this. Well, where is the testimony that says he wasn't doing it every day? Well, his declaration and his testimony before the court, he admits that he's doing these things. What he says is that these things cause, any activity causes exacerbation and pain. So if he does something like cook, I believe his declaration, he specifically says they actually eat out and take out because it's difficult to cook. But if he does things, then he has to rest and recuperate. It seems like you could argue that, you know, he does do these things every day, but he basically spends most of the day resting and recuperating, and that that was misunderstood. That seems like a pretty good argument to me, but I don't think that's the some days are good, some days are bad argument, because it seems like that's sort of true every day, the way I read it anyway. I wouldn't actually distinguish between what you said and what our argument is, because what I think we're trying to say is there are some days he actually says he feels good. So there are good days in the record where he's able to do more and doesn't necessarily suffer. But then there are bad days, or maybe something in between good and bad, where if he takes the kids to school or if he does something, then he has to rest. He has to put Epsom salt baths, and he has to take these sort of recuperative efforts, which translates to not being able to consistently work in the workforce. So at ER 42, he says, I have to get my kids to school and make their lunch and all of that every day. And so basically most days, my use of my hands, you know, I'll make them breakfast, make them lunch, and I have to drive them to school, and by the end of the day, I'm pretty worn out. So I think you could say maybe that he's too worn out to work because these are not enough. He doesn't do enough things that would translate to work, but I just am not seeing this only some good days part. I don't know that we're saying there's only some good days. I think we're saying all of it's true. There are some good days. There are days where I believe he testified before the ALJ saying some days I feel pretty good, and that was sort of the end of it. You know, we didn't get into, you know, how much are you able to do on those days. But the key here was that it's not consistent. He can't consistently do what it would take to work. So if taking the kids to school and making breakfast and lunch is the extent of what he can do, there's nothing left, and he has to recuperate. I mean, I think the good days and bad days, I was speaking more about the larger activities that the ALJ, I thought, overly focused on, which was, you know, the vacations. He's got one report in his medical record where he helped his parents move. That was brought up maybe more by the commissioner than the ALJ, but that seems to keep being brought up. And what the record actually shows is he was taking steroid medications to do that. It hurt him. So my sort of focusing on the good days and bad days maybe is too simplistic. I think what's happening here is sometimes he pushes himself. Sometimes he has to go move his parents because it's an emergency, but he suffers as a result. And instead of taking from those things to see that this is a person who cannot do what he used to do, it was translated into, well, if he could do that, it could work. Thank you. Can I ask you about the chiropractors? Given that they're not owed the same weight as the treating sources under the regulations here, why isn't the ALJ's analysis sufficient as to Dr. Mahaffey and Dr. Robinson? Unfortunately, it's sort of the same argument winds through all of the providers. Each provider, including Mr. Sackowitz, is undermined by this idea that what they're saying can't be true because his activities are too robust. So I agree with you, and I mean, the law is clear that chiropractors, there only needs to be germane reasons to disregard a chiropractor. So I see that they're a different type of provider. But the chiropractors are consistent with both Mr. Sackowitz and his treating medical providers. And all of them have been undermined in the record. So it's almost like the whole thing falls apart if we discredit everyone. So discrediting the chiropractor fits in with the discrediting of the treating source and Mr. Sackowitz. I agree they should probably be given less weight, but they're consistent with Dr. Bott and Dr. Warburton. And that is not considered to bolster Dr. Bott or Dr. Warburton's or Mr. Sackowitz's testimony. So it seems like the ALJ discounted Bott and Robinson because they both essentially said that minimal exertion causes your client to be totally debilitated. And it seems like that may be inconsistent with the daily activities he was doing. Can you explain to me why it wasn't wrong? Why the ALJ erred in thinking that the daily activities we were just discussing didn't show that this idea that minimal exertion totally wipes him out is wrong? Well, to completely give those two providers no weight, I believe he gave both of them no weight. What he said is that they were vague and that they were inconsistent with his activities. So again, it's overblowing these sort of one-off activities. The moving the parents or, I mean, that was really the biggest one. The more regular routine activities that he was doing, taking the kids to school, those did cause him to be debilitated. His testimony is that he would have to rest and nap, assuming we're not on a good day, right? Sort of the more average day, any sort of activity really does wipe him out. He has to ice his hands if he does any kind of writing. He has to rest. He has to nap. He has to take Epsom salt baths. I think that's what's getting completely diminished by these sort of the over-reliance on these activities that I don't think prove what the ALJ is saying they prove. So let me just ask you one question. Can I direct your attention to the SSRs, SSR 12-2P? Yes. So I didn't see that cited in the ALJ's opinion. It was not. So, but let me ask you this. How does it help your argument? Well, so the idea that the ALJ really has to look at fibromyalgia differently, that's what the SSR and Revels informs the analysis that I think the ALJ is supposed to have. That the ability to accomplish something once, a big thing once, or smaller things with larger consequences, like making lunch for the kids, creating pain and requiring a nap for him, whereas it wouldn't for someone without fibromyalgia. That's what's lost in the ALJ's opinion. So, you know, whether or not he cites it, he does talk about fibromyalgia. He even mentions good and bad days. But then he proceeds to wipe out all of the treating source opinions based on these notes that are in the medical record that Mr. Sacklitz is telling his medical providers about. That he's, you know, trying to ride a bike for exercise, or that he, you know, moved his parents, or that he, there was a chiropractic note where he says, I was on a vacation and I didn't touch the computer for 10 days and my hands felt better. So the chiropractor's taking this as like, well, he needs to not be on the computer because this will help. So these things are in the medical record that the ALJ is pulling out and using against him, or using to undermine those very providers. Thank you. Did you want to reserve the balance of your time? Yes, please, Your Honor. Thank you. Good morning, Your Honors. Can you hear me adequately? Thank you. My name is Shay Bond. I'm here on behalf of the Acting Commissioner of Social Security. It seems to be the focus today is on the activities of daily living, so I think I'm going to address that aspect of the case. I disagree with my opposing counsel that these activities were one-offs. When you put all of these activities together, it paints a picture of someone who was, within the facts of this case, perhaps in a different case we'd have a different situation. But within the facts of this case, you put these activities together and he's much more functional than what claimant actually alleged, and then the extent to which certain medical providers said that he was limited. And it's not the ALJ not recognizing that he has fibromyalgia. The ALJ recognized that that was a severe impairment and was significantly limiting as shown by the RFC finding. So to the extent that Your Honor has asked about 12-2P, I don't see any conflict there. The ALJ recognized that that was the impairment at issue. What 12-2P goes on to say, though, is that the ALJ has to assess the claimant's statements according to the agency's other policies, and that is what happened here. The ALJ recognized that while claimant was alleging these really dramatic symptoms that literally like holding on to a cup for a few minutes would cause him to have this kind of crippling upper extremity pain, where he was down for the count for hours to a couple of days afterward. And when you look to the extent of what he was doing during each day, if that were the case, then he wouldn't be doing anything every day. As I understood 12-2P or whatever it is, it mainly – I don't quarrel with what you just said, but it also really seems to indicate that you need to look at the nature of this diagnosis, fibromyalgia, and you look at it longitudinally over a period of time. And it specifically notes that this condition waxes and wanes, as we discussed in the Revel case, and there can be quote-unquote good days and bad days, which is reflected in ALJ's opinion. But there's a lot more to it than just – I think you really do need to look at both his condition when he testifies about the pain and inconvenience and all that other stuff that he testified to, along with the things that he did, and you've got to look at it completely. And I question whether or not the ALJ did that here. He zeroes in on things that appear to be inconsistent with working. Well, I'm going to disagree, and the reason I disagree is because I think when you look at how the ALJ was analyzing the treatment – well, first of all, there's a very robust discussion from the ALJ about the claimant's allegations of this waxing and waning and how any little thing is going to cause them to have this crippling pain. So the ALJ is recognizing that. I think why I disagree is I see the ALJ's decision as going through a very detailed account of what the treatment record showed longitudinally, as Your Honor was saying. Let's look at the whole picture here, the claimant's condition over time over these several years. And the ALJ was recognizing when he would go into his treatment providers and would say, you know, I am hurting, recognized the treatment he was getting, he was getting medications, he'd gotten some injections, chiropractic treatment, and said when the claimant would go in and say, you know, I'm feeling excess pain, in relation also to when he was doing his daily activities. So the ALJ recognizes when the claimant would go in and say, like, well, I went and I, you know, visited my parents and I was helping with the debris removal, that he had symptomology. But he also, the ALJ recognized that he had the MedDraw pack, which I think is like a steroid treatment, and that helped him get through that trip where he was assisting his parents with very heavy debris removal. So the ALJ's decision, when I read it, I see it as punctuated with all of these examples of fibromyalgia pain, he's getting the treatment, he has, you know, symptoms that go up and down with his pain complaints, but then he's still able to do a measure of daily activities that are just, when I see this, and I think the ALJ is accurate, it's grossly inconsistent with the way the claimant describes the symptoms. Which of those daily activities do you zero in on? Well, I would say, and the ALJ highlights this, where it's like holding a cup, like a coffee cup, for like a few minutes, like I think it was like five minutes, or just simply writing his name with a pen, or typing on the, you know, hitting a button. I think he even said like with the DragonSpeak software, he would just hit the button and it would cause this burning, persistent pain that would last for like several hours to actually a couple of days. I think my opposing counsel mentioned like he had to ice his arms for days. So that's related to like his grip strength on a cup. But he, within his treatment records, he was describing riding his bicycle for two hours a day, five days a week. That is not hands-free, you have to grip onto a steering wheel. And I know he said that he used pedal assist sometimes, but that's when he had his two children on the back of a cargo bike, riding through the hilly streets of San Francisco. You still have to grip those steering wheels, or excuse me, the handlebars. And then he also made the allegation, I would point to the declaration that he submitted after the hearing. Pull that up. This is on page 249 of the record, going on to 250. And he said, actually, on a good day, I struggled and was barely able to drive with the pain I experienced as a result of vibration and the pain associated with steering. But then we have evidence in the record that he drove a van up to Truckee. And if anybody from the Bay Area knows, on a good day, it takes about a three-hour drive one way to go to Truckee. That's an inconsistency. And especially when he's saying that just engaging this very minor activity for just a few minutes at a time throws him into these spasms, pain, fatigue, where he has to lie down, has to be soaking in the bath, has to be icing his arms. That's the inconsistency. I thought the coffee cup thing was like an isolated incident, I thought. And that it was more the typing that caused this real problem. And I don't know that the typing, like why, so the dog walking, it sounds like he's wearing a thing around his waist so he doesn't hold the leash. I'm not sure what about his daily activities is inconsistent with the idea that something about the movement of typing puts him into this pain. So, and he absolutely said that typing put him into this very, again, these extreme symptoms and limitations. But what I would point out is that if that was actually happening, and he said he had to do that for his children's homework. I think he was like checking in on them, like that was the school requirement. And so he could only do that for like an hour. And then that's when I think he was describing that he has to like lay down and put the ice on his arms for two days straight. That is not consistent then with him describing other activities that he was engaging in, which was he was the home care provider for his children and his family. You know, he was getting the groceries, he was cooking dinner for them, you know, making the breakfast. So he describes being able to do other daily activities that what I think the ALJ was getting to was that that would not be possible if, after saying typing for a very minimal amount of time, he would not be able to engage in those other activities that he described. But how do we know that if, I mean, the posture of typing is not the same as these other things he would be doing, right? But, well, but what I'm saying is that he's actually saying what the claimant had claimed was that the action of typing is what put him into these cramping and painful spasms. And then he has to rest and put ice on his arms for 24 hours. So if he's having to do that, then he's essentially saying he can't do anything else. And that's where I say the inconsistency is. But he's mostly not typing, right? He's mostly not typing. I thought he was really avoiding typing so that he could do the groceries and the cooking. But what I'm saying is that it sounds unrealistic that he actually experiences that level of cramping and spasm if he is able to do other activities. Can I ask that maybe in a different way? Because, you know, all these daily activities that the ALJ focuses on, I guess my question to you is how are these activities transferable to a work setting? Especially given his past work in IT and all these severe symptoms that he is talking about when using a computer or a phone. Well, to focus back on what the ALJ found, I don't see in the ALJ's decision where he says that these are transferable skills to a work setting. And that is definitely one way that daily activities can be relevant to an assessment of functional capacity. But the second aspect of daily activities is that they show that the symptoms alleged are exaggerated or they're just not consistent with the record. Isn't the ALJ required to articulate how these daily activities are transferable to a work setting? Well, I don't... It seems like that's... No, it's not transferable to a work setting. An ALJ could absolutely make that finding and then would be required to articulate reasons for that finding. But this court's case law in cases like Molina state that that's one aspect. But the other aspect is could it show that the symptoms are exaggerated or they're just inconsistent with the claims vis-a-vis what is in, say, the treatment records. So there's no per se rule that an ALJ has to discuss transferable skills to the extent that I think that you're asking about. So long as the ALJ... I'm sorry, I didn't mean to interrupt your honor. I just wanted to ask you also about Dr. Vatt's October 17th letter. That was the more detailed one? Uh-huh. Because she writes that he experiences chronic pain in his neck, arms, shoulders, upper back, hips, knees, and feet. And that activities such as typing and phone use for beyond five minutes at a time result in debilitating depilation of his energy. And I guess I'm trying to figure out how is this vague. So because Dr. Vatt had issued two separate opinions, there was one earlier in the year, and I think that opinion just said, I support the claimant getting Social Security disability or any other kind of disability. This one's very short. That one was very short. And so I believe that was the ALJ's saying that it was vague or nonspecific. It would have been referencing that specific opinion. But when the ALJ was considering Dr. Vatt's overall opinions, also cited the daily activities as a basis for finding that opinion inconsistent with what the rest of the record said. And gave it no weight. Gave it no weight, correct. And I would point out that the ALJ did have the opinion of Dr. Williams, the reviewing physician, who the ALJ gave the most weight to, I think that's what was said in the decision, and found that opinion actually more consistent with the record than the other opinions. And yes, there are three or four opinions, or possibly three opinions, excuse me, that claimant would say supports his claim, but they still have to be supported by and consistent with the record, and the ALJ correctly found that those opinions were not. And I would also point out... I just, I'm still struggling with, it seems like the treating doctors knew he was doing some daily activities, but also were saying, he can't type. And that's what he is saying. I can't type. I can do these other things for a little bit of the day, but then I'm tired and I really can't type. And then the work that ultimately the ALJ says he can do is go back to your old job and type. And I'm just fundamentally having trouble understanding how that could possibly fit together. Well, and again, I mean, that's taking at face value, though, that when the claimant was describing how the typing affected him was accurate.  That it was reasonable for the ALJ not to believe that this minor act of typing resulted in these very extreme limitations. And it's because... If the doctors thought that there... I mean, it seems like the doctors thought fibromyalgia could cause him this problem with typing, and yet still allow him to ride a bike. And it seems like you're saying that's inconsistent, but the doctors didn't think it was inconsistent. So how did the ALJ... Where is the ALJ's authority to understand it to be inconsistent? Well, I would cite the Rollins case. So the Rollins case allows an ALJ to rely on daily activities to discount aspects of even a treating physician's opinion. Only if it's really inconsistent. I'm sorry, could you repeat that? Only if it's really inconsistent, right? And so I guess that's the question. Is this something about how you ride a bike actually the same thing as the typing? Well, and I think, though, maybe I'm not articulating this as well as I can, but I think the point is that the ALJ did not agree that the typing, for a couple of minutes or however long he was saying he was doing it, actually resulted in the types of symptoms and limitations that he claimed. And it's because he has all these other activities that he's able to engage in even after doing the typing. So I think that's the point. I'm not sure if I'm explaining that well enough. But it's not the fact that the ALJ believed that the typing caused these symptoms, and it's because he engaged in all these other activities afterward, when he's saying that he's down for the count for like 48 hours, would be my response. And just one last point I wanted to make. So the one opinion that the ALJ was found to have aired in evaluating Dr. Warburton, when you look at that opinion, it's actually fairly consistent with the ALJ's existing RFC findings. So I do believe there's other opinion evidence that actually supported it. There are a couple of limitations that could – there's an open-ended question about whether other work that the claimant could perform if those were adopted. But for the majority portion of Dr. Warburton's opinion, I think it's actually supportive of the ALJ's decision. So there is more opinion evidence and support, would be my response. If the court has no further questions, we would ask you to affirm the district court's order which had a partial remand. Thank you. Thank you very much. You may proceed. Thank you. I think the only thing that I would like to add, I just heard my opposing counsel say that Dr. Warburton, which was the opinion that the district court – was the basis for the district court remand, was that the ALJ improperly discounted Dr. Warburton's opinion. What Dr. Warburton says is that there are more limitations than what the ALJ had in the RFC. So it supports all of these other things in the record, including Mr. Sackowitz, including Dr. Bott, including the two chiropractors. And if we look at the testimony from the vocational expert, she testifies that if he is limited to bilateral handling and fingering, which is typing, which is the IT work that I'm happy to see that the bench is seeing that that's sort of the crux of this case. The vocational expert said that he would be unable to do any work. So if credited as true, even on a minor scale, even the limitations Dr. Warburton adds, and crediting anything that's said by any of these treating doctors or Mr. Sackowitz, I believe the vocational expert gave enough into this record to make this case an award of benefits. Can I ask you to respond to the notion that your client said a little bit of typing makes them need to ice for days and how that's consistent with the daily activities? Because I now understand that to be the sort of the crux of the government's argument. I think what's in the record and what he has said consistently is he's limited to about five minutes of computer work, and that will exacerbate. I think it's oversimplifying it to say that every time he touches a computer button, everything goes haywire. What this is is if he types, he struggles. He has pain as a result. So the more he types or the more he spends on the computer, the more he does. I think there's also phone work that's being on the telephone that's in the record. That exacerbates. So the more that he does that in connection or combination with other things that are using fine motor skill manipulation, the worse he struggles and that he will have to ice. I think my opposing counsel is hanging on a couple of little examples in the record to almost make it seem, I think she used the word dramatic, to make it seem like this overly extreme reaction, when I think what my client's trying to do is convey the level of pain he's experiencing. It's not the same every single time. And I don't believe the record reflects him saying it's exactly the same every time, but I think he's trying to convey that using a computer causes him incredible pain and re-aggravates or whatever the language is, whether it's a re-aggravation or if the nerves are reacting or whatever's going on that causes him distress. Thank you very much. Thank you, Your Honors. The case of Craig Sokowitz versus Kilo Kijakazi is now submitted. I want to thank you both for your oral argument presentations. Ms. Bond, thank you for coming here today from the East Coast. We really appreciate it. Oh, you are? Oh, it says Baltimore, Maryland here. I see. Okay. Well, thank you for being here. The case is submitted and we are adjourned. Thank you all.
judges: MURGUIA, PAEZ, FRIEDLAND